O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

LOLITA ARQUETTE,                    ) Case No. EDCV 09-02295-OP
                                    )
                  Plaintiff,        )
                                    )
        v.                          ) MEMORANDUM OPINION AND
                                    ) ORDER
MICHAEL J. ASTRUE,                  )
Commissioner of Social              )
Security,                           )
                                    )
                  Defendant.        )
_____   )

        The Court[1] now rules as follows with respect to the eight disputed issues

listed in the Joint Stipulation ("JS").[2]

_____

        [1]  Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed
before the United States Magistrate Judge in the current action.  (See Dkt.
Nos. 7, 9.)

        [2]  As the Court advised the parties in its Case Management Order, the
decision in this case is being made on the basis of the pleadings, the
Administrative Record and the Joint Stipulation filed by the parties.  In
accordance with Rule 12(c) of the Federal Rules of Civil Procedure, the Court
has determined which party is entitled to judgment under the standards set
forth in 42 U.S.C. § 405(g).

1

# I.

## DISPUTED ISSUES

As reflected in the Joint Stipulation, the disputed issues which Plaintiff is raising as the grounds for reversal and/or remand are as follows:

    (1)    Whether the Administrative Law Judge ("ALJ"), F. Keith Varni, properly considered the treating physician's opinions;

    (2)    Whether the ALJ properly considered the treating psychiatrist's opinions;

    (3)    Whether the ALJ properly considered the treating clinician's opinions;

    (4)    Whether the ALJ properly considered the side effects of Plaintiff's medications;

    (5)    Whether the ALJ properly considered the severity of Plaintiff's mental impairment;

    (6)    Whether the ALJ properly considered the consultative examiner's findings;

    (7)    Whether the ALJ properly considered the demands of Plaintiff's past relevant work; and

    (8)    Whether the ALJ should have obtained vocational expert testimony.

(JS at 2-3.)

# II.

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine whether the Commissioner's findings are supported by substantial evidence and whether the proper legal standards were applied. DeLorme v. Sullivan, 924 F.2d 841, 846 (9th Cir. 1991).  Substantial evidence means "more than a mere scintilla" but less than a preponderance.  Richardson

2

1    v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971);

2    Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 575-76 (9th Cir.

3    1988).  Substantial evidence is "such relevant evidence as a reasonable mind

4    might accept as adequate to support a conclusion."  Richardson, 402 U.S. at

5    401 (citation omitted).  The Court must review the record as a whole and

6    consider adverse as well as supporting evidence.  Green v. Heckler, 803 F.2d

7    528, 529-30 (9th Cir. 1986).  Where evidence is susceptible of more than one

8    rational interpretation, the Commissioner's decision must be upheld.  Gallant v.

9    Heckler, 753 F.2d 1450, 1452 (9th Cir. 1984).

10                                          **III.**

11                                   **DISCUSSION**

12   **A.    The ALJ Failed to Properly Consider the Opinions of the Treating**

13          **Physician.**

14          Plaintiff testified at the hearing before the ALJ that her treating physician

15   was Ibrahim Sumarli, M.D.[3]  (Administrative Record ("AR") at 39-40.)

16   According to the record, Plaintiff was under Dr. Sumarli's care at the Riverside

17   Neighborhood Health Center beginning in late 2006.  (Id. at 463, 479, 500,

18   503, 505, 528, 531, 533.)  Of particular relevance here is Dr. Sumarli's March

19   27, 2007, Medical Report of Plaintiff.  In that report, Dr. Sumarli indicated that

20   Plaintiff suffered from hypertension, fibromyalgia, carpel tunnel syndrome, and

21   migraine headaches.  (Id. at 503.)  Dr. Sumarli reported that Plaintiff was

22   unable to work full- or part-time and that she would only be able to work in a

23   zero-stress situation.  (Id.)  According to Dr. Sumarli, Plaintiff could not

24   participate in training-type activities.  (Id.)  In denying Plaintiff's application,

25   the ALJ made no mention of Dr. Sumarli or his March 27, 2007, report.

26   _____

27          [3]  In the transcript of the hearing, the doctor's name is phonetically

28   spelled "Somarli."  (AR at 39.)

                                          3

It is well established in the Ninth Circuit that a treating physician's opinion is entitled to special weight, because a treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual.  McAllister v. Sullivan, 888 F.2d 599, 602 (9th Cir. 1989).  "The treating physician's opinion is not, however, necessarily conclusive as to either a physical condition or the ultimate issue of disability."  Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989).  The weight given a treating physician's opinion depends on whether it is supported by sufficient medical data and is consistent with other evidence in the record.  20 C.F.R. §§ 404.1527(d), 416.927(d).  Where the treating physician's opinion is uncontroverted by another doctor, it may be rejected only for "clear and convincing" reasons.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991).  If the treating physician's opinion is controverted, as appears to be the case here, it may be rejected only if the ALJ makes findings setting forth specific and legitimate reasons that are based on the substantial evidence of record.  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002); Magallanes, 881 F.2d at 751; Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987).  The ALJ can "meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  Thomas, 278 F.3d at 957 (citation and quotation omitted).

The ALJ's failure to provide any reasons, let alone legally sufficient reasons, for discounting Dr. Sumarli's opinions warrants remand.  See Embrey, 849 F.2d at 422 (in disregarding the findings of a treating physician, the ALJ must "provide detailed, reasoned and legitimate rationales" and must relate any "objective factors" he identifies to "the specific medical opinions and findings he rejects"); see, e.g., Nelson v. Barnhart, No. C 00-2986 MMC, 2003 WL 297738, at *4 (N.D. Cal. Feb. 4, 2003) ("Where an ALJ fails to 'give

4

1   sufficiently specific reasons for rejecting the conclusion of [a physician],' it is

2   proper to remand the matter for 'proper consideration of the physicians'

3   evidence.'") (citation omitted).  Accordingly, remand is required for the ALJ to

4   set forth legally sufficient reasons for rejecting the opinions of Dr. Sumarli, if

5   the ALJ again determines rejection is warranted.[4]

6   **B.    The ALJ's Consideration of the Opinions of the Treating**

7   **Psychiatrist.**

8           Plaintiff began psychiatric treatment on April 14, 2007, at the Riverside

9   County Department of Mental Health.  (AR at 546-52.)  In an April 26, 2007,

10  Initial Psychiatric Assessment of Plaintiff, Denise Joseph, M.D., reported a

11  diagnosis of Major Depressive Disorder with psychotic features, rule out

12  bipolar disorder.  (Id. at 556.)  Dr. Joseph assessed Plaintiff's Global

13  Assessment of Functioning ("GAF") at 40 currently, with the highest score

14  during the past year as 40.  (Id.)[5]  Dr. Joseph reported that Plaintiff presented

15  with disorganized/incoherent speech, depressed mood, feelings of

16  worthlessness, decreased ability to concentrate, fatigue, and decreased sleep.

17  (AR at 557.)  Dr. Joseph also noted that Plaintiff suffered from excessive

18

19          [4]  The Court expresses no view on the merits.

20

21          [5]  A GAF score is the clinician's judgment of the individual's overall
22  level of functioning.  It is rated with respect only to psychological, social, and
    occupational  functioning, without regard to impairments in functioning due
23  to physical or environmental limitations.  See American Psychiatric
    Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-
24  IV") at 32 (4th Ed. 2000).  A GAF score of 31-40 indicates:  "Some
    impairment in reality testing or communication (e.g., speech is at times
25  illogical, obscure, or irrelevant) OR major impairment in several areas, such
26  as work or school, family relations, judgment, thinking, or mood (e.g.,
    depressed man avoids friends, neglects family, and is unable to work . . . .)."
27  Id. at 34.

28

                                              5

anxiety/worry, recurrent distressing dreams, feelings of recurrent traumatic event, muscle tension, and irritability.  (Id.)

A Mental Status Exam on the same date resulted in findings of poverty of speech, psychomotor slowing, poor eye contact, and distant interactions.  (Id. at 559.)  Plaintiff was depressed and her thought content was bizarre and poorly organized.  (Id.)  Plaintiff reported visual hallucinations in the form of shadows.  (Id.)

In a June 14, 2007, Psychiatric/Psychological Impairment Questionnaire, Dr. Joseph reiterated the diagnosis of severe major depressive disorder with psychotic features.  (Id. at 538.)  Dr. Joseph indicated that Plaintiff exhibited the following positive clinical findings:  poor memory; moderate appetite disturbance; restless sleep; personality changes; mood disturbances; emotional lability; hallucinations; anhedonia or pervasive loss of interests; psychomotor agitation or retardation; difficulty thinking or concentrating; time or place disorientation; social withdrawal or isolation; blunt, flat or inappropriate affect; decreased energy; intrusive recollections of a traumatic experience; and hostility and irritability.  (Id. at 539.)  Dr. Joseph concluded that Plaintiff was mildly limited in her ability to carry out simple one or two-step instructions; ask simple questions or request assistance; and be aware of normal hazards and take appropriate precautions.  (Id. at 541-43.)  The doctor further concluded that Plaintiff was moderately limited in her ability to understand and remember detailed instructions; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; travel to unfamiliar places or use public transportation; and set realistic goals or make plans independently.  (Id.)  In addition, Dr. Joseph reported that Plaintiff was markedly limited in her ability to remember locations and work-like procedures; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule,

maintain regular attendance and be punctual within customary tolerance; sustain ordinary routine without supervision; work in coordination with or proximity to others without being distracted by them; complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Id. at 538.) Dr. Joseph explained that she was unable to determine Plaintiff's prognosis at the time of the report. (Id.) The doctor opined that Plaintiff is not a malingerer, is incapable of performing even low stress work, and likely would be absent from work twice a week as a result of her impairments or treatment. (Id. at 544-45.)

The ALJ rejected the findings of Dr. Joseph, as follows:

[W]hat is said in the form from Denise Joseph, M.D. is astounding . . . . Dr. Joseph holds herself out principally as an internist who also dabbles in psychology. However, a graduate of an off-shore medical school, she is not Board certified in psychology or anything else and when she completed the form at Exhibit 24F, had seen the claimant at most twice, if that. The plethora of markedly limited mental functions makes one wonder why the doctor did not institutionalize the claimant, since that number would render her unable to take care of herself, perform any self-help activities, or even entertain any activities of daily living. This is as groundless an assessment as I have seen. It is thoroughly rebutted by the psychological consultative examinations and even more so by the State agency Board certified psychiatrists.

(Id. at 28 (citations omitted).)

The ALJ's points are not well taken. First, the ALJ concludes that Dr. Joseph "holds herself out principally as an internist who also dabbles in

7

psychology."  The ALJ relies on information from the California Medical Board listing internal medicine as Dr. Joseph's primary specialty, with psychiatry listed as her secondary specialty.[6]  (Id. at 189.)  The order in which Dr. Joseph listed her specialties does not indicate that she is any less trained or capable in either area of practice.  In addition, the fact that Dr. Joseph was employed at, and treating Plaintiff through, the Riverside County Department of Mental Health indicates that at the time of the assessment she was employed as a psychiatrist, not merely "dabbl[ing]" in the field.  Further, Dr. Joseph doesn't dabble in "psychology" at all, as she is a psychiatrist not a psychologist.

Next, the ALJ faults Dr. Joseph for being a graduate of an "off-shore" medical school.  According to the California Medical Board, Dr. Joseph is a graduate of the American University of the Caribbean School of Medicine.  However, regardless of where she attended medical school, Dr. Joseph is duly licensed to practice medicine within the State of California.  Ironically, the two consultative examiners relied on by the ALJ also attended foreign medical schools.  According to the California Medical Board, Reynaldo Abejuela, M.D. attended medical school at the Far Eastern University in the Philippines and Sohini Parikh, M.D. attended Gujarat University Medical College in India.

The ALJ also rejected Dr. Joseph's opinions because she is not "Board certified in psychology or anything else."  Of course, the Court would not expect Dr. Joseph, a psychiatrist, to be Board certified in psychology.  In addition, consultative psychiatrist Dr. Parikh stated on his report that he is Board eligible (id. at 329), but there is no indication in the record or through

_____

[6]  The Court notes that the California Medical Board currently lists Dr. Joseph's primary specialty as psychiatry, with internal medicine listed as her secondary specialty.  http://www2.mbc.ca.gov/LicenseLookupSystem/ PhysicianSurgeon/Lookup.aspx?licenseType=A&licenseNumber=51242.

the medical board that he has ever obtained formal certification.  In addition, while Dr. Abejuela states in his report that he is a Diplomate of the American Board of Psychiatry and Neurology (id. at 251), his certification is not reflected through the state medical board.[7]  Neither is there any evidence establishing the Board certification of the other identifiable state agency psychiatrist, David E. Goss, M.D.[8]  Accordingly, it was inappropriate for the ALJ to conclude, based on the information reflected by the California Medical Board, that Dr. Joseph was not Board certified, or at the very least Board eligible.  Moreover, even assuming that Dr. Joseph is not Board certified, the ALJ improperly rejected her opinions in favor of other apparently non-certified psychiatrists.

The ALJ also rejects Dr. Joseph's findings because the extreme limitations reported by Dr. Joseph would have rendered Plaintiff incapable of caring for herself and would have warranted that she be institutionalized. However, although Dr. Joseph believed Plaintiff to be quite impaired, she clearly did not feel that Plaintiff required hospitalization or any other form of "institutionaliz[ation]."  It was inappropriate for the ALJ to reject Dr. Joseph's findings by substituting his own medical conclusions for that of the physician, particularly where the ALJ did not even seek the testimony of a medical expert.

_____

[7]  This Court has no reason to doubt that Dr. Abejuela is Board certified.  However, the discrepancy in information merely highlights the fact that the California Medical Board, upon which the ALJ apparently relied in determining Dr. Joseph's qualifications, might not maintain accurate and up-to-date information on a physician's status with the Board.  Notably, the medical board's homepage does not guarantee the accuracy of information regarding a physician's Board certification and refers inquiries into those matter to the American Board of Medical Specialties.

[8]  There is one other state agency psychiatrist relied upon by the ALJ. However, that physician's signature is illegible and his printed name does not appear on the report.  (AR at 339-52.)

1   See Tacket v. Apfel, 180 F.3d 1094, 1102-03 (9th Cir. 1999) (finding it

2   inappropriate for an ALJ to substitute his own medical judgment for that of a

3   treating physician); see also Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir.

4   1975) (noting that hearing examiner was not a qualified medical expert).

5        Next, the ALJ concludes that Dr. Joseph's opinions are thoroughly

6   rebutted by the psychological consultative examinations and even more so by

7   the State agency Board certified psychiatrists.  First, as explained above, it is

8   not clear that all, or any, of the doctors relied on by the ALJ were Board

9   certified, or that Dr. Joseph was not Board certified.  Second, the most recent of

10  the reports relied on by the ALJ was completed in May 2005 (AR at 339),

11  approximately two years before Dr. Joseph began treating Plaintiff and more

12  than two years prior to the ALJ's decision.  The ALJ does nothing to account

13  for the possibility of deterioration in Plaintiff's symptoms between the time the

14  state agency physicians considered Plaintiff's condition and the time she began

15  treatment with Dr. Joseph.  Third, the fact that a physician's opinion is

16  inconsistent with other evidence might be reason to conclude it not worthy of

17  "controlling weight," but it is not a sufficient reason to reject the opinion

18  outright.  Orn v. Astrue, 495 F.3d 625, 631-32 (9th Cir. 2007) (quoting SSR

19  96-2p; 20 CFR § 404.1527.

20       Finally, the ALJ rejected Dr. Joseph's opinions because, at the time she

21  completed the Psychiatric/Psychological Impairment Questionnaire, she had

22  seen the claimant "at most twice."  The "[l]ength of the treatment relationship

23  and the frequency of examination" are factors the ALJ may consider in

24  determining the weight to be given the opinions of a treating source.  Orn, 495

25  F.3d at 631.  Moreover, it is correct that Dr. Joseph had recently begun treating

26  Plaintiff at the time she completed the Psychiatric/Psychological Impairment

27  Questionnaire.  However, because the Court has decided above that this action

28  must be remanded for further consideration of Dr. Sumarli's opinions, the

10

1   Court also directs the ALJ to further consider Dr. Joseph's opinions and to set

2   forth legally sufficient reasons for rejecting those opinions, if the ALJ again

3   determines that such rejection is warranted.[9]

4   **C.     The ALJ's Consideration of the Opinions of the Treating Social**

5   **Worker.**

6          On April 16, 2007, a Licensed Clinical Social Worker ("LCSW") at the

7   Riverside County Department of Mental Health conducted an Intake

8   Assessment of Plaintiff.  The social worker estimated Plaintiff's GAF to be 50

9   currently, with the highest GAF during the past year at 50.[10]  (AR at 546.)  The

10  social worker further noted symptoms consistent with Dr. Joseph's later report.

11  (Id. at 547-55.)  The ALJ did not mention the findings of the social worker in

12  his decision.

13         Standing alone, the ALJ's failure to give reasons for rejecting the

14  evaluation performed by the social worker is not reversible error because an

15  LCSW is not an "acceptable medical source" within the meaning of the

16  regulations.  Nonetheless, information from "other sources" may be considered

17  to assess impairment severity and its affect on the ability to work.  20 C.F.R. §§

18  404.1513(a), (d), 416.913(a), (d) (defining an "acceptable medical source," and

19  explaining that information from "other sources" also may be considered); see

20  Gomez v. Chater, 74 F.3d 967, 970-71 (9th Cir. 1996) (holding that the

21  regulations permit the Commissioner to give "less weight" to opinions from

22  "other sources").  Because the Court has concluded that this action must be

23

24  _____

         [9]  The Court expresses no view on the merits.

25

26         [10]  A GAF score of 41-50 indicates "[s]erious symptoms (e.g., suicidal

27  ideation, severe obsessional rituals, frequent shoplifting) OR any serious
    impairment in social, occupational, or school functioning (e.g., no friends,

28  unable to keep a job)."  DSM IV at 34.

11

1    remanded for further consideration of Dr. Sumarli's opinions, the Court also

2    directs the ALJ to further consider the opinions of the LCSW.

3    **D.    The ALJ Did Not Improperly Neglect to Consider Side Effects of**

4            **Plaintiff's Medications.**

5            Plaintiff explains that, according to a report from Dr. Joseph, she was

6    taking "Depakote ER, Cymbalta and another medication that is unidentifiable."

7    (JS at 27.)  Plaintiff then discusses the potential side effects of these

8    medications as described by WebMD and concludes that the ALJ erred by not

9    considering these side effects as they might have related to Plaintiff's

10   impairment.  (Id. at 27-28.)  The Court does not agree.

11           Under Ninth Circuit law, the ALJ must "consider *all* factors that might

12   have a 'significant impact on an individual's ability to work.'"  Erickson v.

13   Shalala, 9 F.3d 813, 817 (9th Cir. 1993) (quoting Varney v. Sec'y of Health &

14   Human Servs., 846 F.2d 581, 585 (9th Cir.), relief modified, 859 F.2d 1396

15   (1988)).  Such factors "may include side effects of medications as well as

16   subjective evidence of pain."  Erickson, 9 F.3d at 818.  When the ALJ

17   disregards the claimant's testimony as to subjective limitations of side effects,

18   he must support that decision with specific findings similar to those required

19   for excess pain testimony, as long as the side effects are in fact associated with

20   the claimant's medications.  See Varney, 846 F.2d at 545; see also Muhammed

21   v. Apfel, No. C 98-02952 CRB, 1999 WL 260974, at *6 (N.D. Cal. 1999).

22           In this case, there was no indication in the medical records that Plaintiff

23   reported any side effects from her medications.  In fact, Plaintiff does not even

24   attempt to argue that the record contains evidence that she suffered from any of

25   the listed side effects, but rather apparently argues that the ALJ was required to

26   consider potential side effects merely because the medications were known to

27   cause some adverse reactions.  In the absence of evidence that Plaintiff actually

28   suffered from side effects of medication, there was no error in the ALJ's failure

12

to mention the potential side effects.  See Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (ALJ did not err in failing to "explicitly address the drowsiness side-effect of [the claimant's] medication" in making an RFC determination as "the ALJ took into account those limitations for which there was record support that did not depend on [the claimant's] subjective complaints"); Thomas v. Barnhart, 278 F.3d 947, 960 (9th Cir. 2002) (alleged side effects need not be considered where no objective evidence supported allegations).

**E.     The ALJ's Consideration of the Plaintiff's Mental Impairment.**

After rejecting the opinions of Dr. Joseph, the ALJ concluded that Plaintiff "has no severe mental impairment and not one of the 'B' criteria exist for any reason."  (AR at 28.)  Plaintiff relies on the opinions of Dr. Joseph, as well as the LCSW from the County of Riverside Department of Mental Health, in arguing that the ALJ failed to properly consider the severity of Plaintiff's mental impairment.  (JS at 30-33.)  The disposition of Plaintiff's claim relies on the weight to be given the opinions of Dr. Joseph and the LCSW.  As this Court has directed the ALJ to reconsider the opinions of Dr. Joseph and the LCSW on remand, the Court further directs the ALJ to reconsider the severity of Plaintiff's mental impairment in light of the renewed assessment of the medical evidence.

**F.     The ALJ's Consideration of the Opinions of the Consultative Examiner.**

After an April 27, 2005, Internal Medicine Evaluation, consultative examiner Denny H. Lee, M.D., concluded, among other things, that Plaintiff could push, pull, turn, and twist with her right dominant upper extremity "frequently," and that she should avoid working near moving machinery or at unprotected heights during her migraine headaches.  (AR at 319-20.)  Without specifically noting these limitations, the ALJ adopted the opinions of Dr. Lee

13

and concluded that Plaintiff maintained the Residual Functional Capacity to "lift and carry 20 lbs. occasionally and 10 lbs. frequently; stand and walk up to six hours and sit for six hours out of an eight hour workday with a few additional limitations."[11]  (Id. at 26.)  Presumably, given his adoption of Dr. Lee's assessment, the limitations reported by Dr. Lee are included in the ALJ's notation of "a few additional limitations."  Ultimately, the ALJ concluded that Plaintiff could perform her past work as "a rental property leasing agent."  (Id. at 28.)  However, the ALJ did not provide a DOT number for this position, or specify that he was relying on the characterization of this job as detailed by Plaintiff.[12]

The ALJ's RFC assessment is relatively consistent with light work, except potentially as Plaintiff is further limited by "a few additional limitations."  The Dictionary of Occupational Titles ("DOT") defines light work as:

> Exerting up to 20 pounds of force occasionally, and/or up to 10
> pounds of force frequently, and/or a negligible amount of force

---

[11]  The Court notes that the conclusion by the ALJ that Plaintiff has "a few additional limitations," appears to be in conflict with the heading of this portion of the ALJ's analysis, which states that Plaintiff "has the residual functional capacity to perform the full range of light work."  (Id. at 25.)  Whether these two conclusions are in fact inconsistent, and whether they are materially inconsistent when considered in light of Plaintiff's past relevant work, is impossible for the Court to determine in light of the ALJ's vague analysis, as discussed below.

[12]  Pursuant to Social Security Ruling 82-61, an ALJ may find a claimant "not disabled" at step four of the analysis where the claimant retains the RFC to perform "[t]he actual functional demands and job duties of a particular past relevant job," or "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy."

constantly (Constantly: activity or condition exists 2/3 or more of the
time) to move objects.  Physical demand requirements are in excess
of those for Sedentary work.  Even though the weight lifted may be
only a negligible amount, a job should be rated Light Work: (1) when
it requires walking or standing to a significant degree; or (2) when it
requires sitting most of the time but entails pushing and/or pulling of
arm or leg controls; and/or (3) when the job requires working at a
production rate pace entailing the constant pushing and/or pulling of
materials even though the weight of those materials is negligible.

DOT, Fourth Ed., 1991, App. C.

Plaintiff's past relevant work as a "rental property leasing agent,"
appears to fit within the DOT's definition of Apartment House Manager (DOT
No. 186.167-018) or Property Manager (Id. No. 186.167-046).  Each of these
positions are described as light work and do not on their face appear to require
more than frequent pushing, pulling, turning, and twisting of the upper
extremities or routine work around moving machinery or at unprotected
heights.  Id. Nos. 186.167-018, 186.167-046.

In addition, at the hearing before the ALJ Plaintiff described her duties
as a leasing agent as:  "To accept phone calls for people, tenants, prospective
tenants interested in apartments, showing apartments, doing move-ins and
move-outs."  (AR at 37.)  In a 2005 Work History Report, Plaintiff described
her job duties in more detail.  Plaintiff explained that her job required her to
"answer phone inquiry for apts - kept records of all calls/showed apts to
prospective tenants/wrote up move-in lease packets + move out paperwork/
wrote up + served delinquent rent notices/accepted rent + deposit monies/
handle complaints/lt bookkeeping/filing/evictions."  (Id. at 135.)  Plaintiff
stated that her job required use of machines, tools, or equipment; technical
knowledge or skills; and writing or completing reports.  (Id.)  In a typical day

15

on the job, Plaintiff estimated that she spent two to three hours walking; one hour standing; three to four hours sitting; one to two hours climbing; forty-five minutes stooping; one hour handling, grabbing, or grasping big objects; and two to three hours writing, typing, or handling small objects.  (Id.)  Plaintiff explained that she frequently was required to lift ten pounds, which was the heaviest weight she lifted on the job.  (Id.)

In light of this evidence, it does not appear that the ALJ's RFC assessment conflicts with Dr. Lee's findings.  However, the record cannot be completely clear on this point without, at the very least, clarification as to Plaintiff's "few additional limitations" and an analysis of whether those limitations can be accommodated by Plaintiff's past work, either as defined by the DOT or as she described it.

Accordingly, on remand the ALJ should further clarify what, if any, limitations Plaintiff has beyond those included in the definition of light work and specify whether those limitations would prevent her from performing her past relevant work.

**G.    The ALJ's Consideration of Plaintiff's Past Relevant Work.**

As explained above, the ALJ concluded that Plaintiff could perform her past work as "a rental property leasing agent."  (Id. at 28.)  However, the ALJ did not provide a DOT number corresponding to Plaintiff's work or indicate that he was relying on Plaintiff's description of that work.  Neither did the ALJ seek testimony from a vocational expert as to the demands of Plaintiff's past work or whether Plaintiff could perform such work in light of her current limitations.  Upon remand, the ALJ is directed to further develop the record as to Plaintiff's specific limitations and identify any limitations Plaintiff maintains beyond those recognized in the definition of light work.  The ALJ should also identify the DOT number corresponding to Plaintiff's past work, or indicate reliance on the job duties identified by Plaintiff, and thoroughly analyze

16

1    Plaintiff's ability to perform that work in light of her current limitations.

2    **H.    Whether the ALJ Should Have Obtained Vocational Expert**

3            **Testimony.**

4            As mentioned above, in concluding, at step four of the social security

5    analysis, that Plaintiff maintained the RFC to perform her past work, the ALJ

6    did not seek the testimony of a vocational expert.  The Plaintiff bears the

7    burden of proving at step four that she is unable to perform her past relevant

8    work.  Thus, although vocational expert testimony might be useful at this step,

9    it is not required.  Matthews v. Shalala, 10 F.3d 678, 681 (9th Cir. 1993).

10   Because the ALJ concluded that Plaintiff did not meet her burden of proving

11   disability at step four of the analysis, he did not err in failing to obtain

12   vocational expert testimony.[13]

13   **I.     This Case Should Be Remanded for Further Administrative**

14          **Proceedings.**

15          The law is well established that remand for further proceedings is

16   appropriate where additional proceedings could remedy defects in the

17   Commissioner's decision.  Kail v. Heckler, 722 F.2d 1496, 1497 (9th Cir.

18   1984).  Remand for payment of benefits is appropriate where no useful purpose

19   would be served by further administrative proceedings, Kornock v. Harris, 648

20   F.2d 525, 527 (9th Cir. 1980); where the record has been fully developed,

21   Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986); or where remand

22   would unnecessarily delay the receipt of benefits, Bilby v. Schweiker, 762 F.2d

23

24          [13]   Whether the ALJ properly concluded at step four that Plaintiff could
25   perform her past work is dependent upon proper consideration of the opinions
     of the treating physicians and other evidence of record.  Accordingly, upon
26   remand the ALJ is directed to reconsider whether VE testimony is necessary
     and whether Plaintiff maintains the RFC to perform her past work in light of
27   the medical record.
28

17

1  716, 719 (9th Cir. 1985).

2        Here, the Court concludes that this is an instance where further

3  administrative proceedings would serve a useful purpose and remedy

4  administrative defects.

5  **IV.**

6  **ORDER**

7        Pursuant to sentence four of 42 U.S.C. § 405(g), IT IS HEREBY

8  ORDERED THAT Judgment be entered reversing the decision of the

9  Commissioner of Social Security and remanding this matter for further

10  administrative proceedings consistent with this Memorandum Opinion.

11

12  DATED: November 24, 2010

13  _____
HONORABLE OSWALD PARADA
United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

18